# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MICHAEL TENNENBAUM, AS TRUSTEE OF ESTANCIAS TWELVE TRUST,** | |
| Plaintiff, | |
| v. | **CIVIL NO.** |
| **FAHAD GHAFFAR and AMIR GHAFFAR,** | |
| Defendants. | |

## COMPLAINT

## I. INTRODUCTION

This case arises from a calculated and deeply deceptive scheme orchestrated by Fahad and Amir Ghaffar to induce a multimillion-dollar investment from Estancias Twelve Trust, managed by Michael Tennenbaum ("Tennenbaum"), into a company that was neither viable nor truthful in its representations. Under the guise of friendship and professional credibility, the Ghaffar brothers presented Innoveo, Inc. ("Innoveo") as a high-growth, cutting-edge technology firm poised for market disruption. In reality, Innoveo was insolvent, lacked the proprietary software it claimed to own, and was artificially propped up by internal dealings designed to mislead investors about its growth and value.

To execute their scheme, the Ghaffars made a series of material misrepresentations regarding Innoveo's valuation, technological capabilities, and market potential. They exploited Tennenbaum's trust, manipulated legal representation to control the flow of information, and used their positions within affiliated entities to fabricate business activity. These misrepresentations were not isolated or negligent—they were deliberate, coordinated, and made with full knowledge

of their falsity, all for the purpose of securing personal financial gain and sustaining the illusion of a thriving enterprise.

The result was predictable and devastating. Tennenbaum invested over $4.4 million based on false pretenses, while the Ghaffar brothers enriched themselves through compensation and influence. Innoveo ultimately collapsed, its assets sold for a fraction of the capital raised, confirming that the company was never what it was represented to be. This action seeks to hold Fahad and Amir Ghaffar accountable for securities fraud, unjust enrichment, and the substantial damages suffered by Estancias Twelve Trust.

## II.JURISDICTION AND VENUE

1. This action arises under 15 U.S.C. §78(j)(b) and 17 C.F.R. 240.10b-5 for securities fraud.

2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all remaining claims in this case, as the claims against those parties share a common nucleus of operative fact with the claims that pose a federal question.

3. Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. § 1331(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.PARTIES

4. Plaintiff Michael Tennenbaum ("Tennenbaum") is an individual, resident of California and co-trustee and co-beneficiary of Estancias Twelve Trust (the "Trust"), a living trust created under the laws of California. Tennenbaum's wife, Suzanne Tennenbaum, is co-trustee and co-beneficiary of the Estancias Twelve Trust. Tennenbaum established the Trust in or around June 25, 2015. Tennenbaum was acting in the interest of Estancias Twelve Trust at all times relevant to this suit.

2

5. Defendant Fahad Ghaffar ("Fahad") is an individual who was born in Pakistan, moved to the United States, settled in Florida, moved to New York, and is now a resident of San Juan, Puerto Rico. He possesses a tax grant pursuant to Puerto Rico Act No. 22-2012, 13 LPRA sec. 10851 *et seq*.

6. Defendant Amir Ghaffar ("Amir") is an individual; upon information and belief, he is a resident of Dubai, UAE; and, upon information and belief, was the Executive Vice Chairman of Board of Directors of Innoveo, Inc. Upon information and belief, he was previously Chief Executive Officer of Innoveo AG. Amir and Fahad are brothers.

## IV. FACTUAL BACKGROUND

7. Plaintiff Michael Tennenbaum is a significant driver of Puerto Rico's economy, evidenced by his substantial personal investments in the local economy, his acquisition of Puerto Rico bonds, and his establishment and funding of the largest agricultural greenhouse in Puerto Rico. His philanthropic endeavors are also noteworthy, with contributions exceeding tens of millions of dollars. In fact, Tennenbaum is the Founding Chair of the Boys and Girls Clubs of Puerto Rico Legacy Council, is Founder of the Tennenbaum Marine Observatories Network, Founder of the Tennenbaum Interdisciplinary Center at the Neuropsychiatric Institute at UCLA, and the Michael E. Tennenbaum Family Endowed Chair in Creativity Research.

8. John Paulson ("Paulson") is the self-made highly successful owner of Paulson & Co. Inc., an investment firm based in New York City that managed billions of dollars in client assets, but now only manages Paulson business and personal assets. Tennenbaum and Paulson are friends.

9. Upon information and belief, in or around 2013, Fahad sought out Paulson and begged for an opportunity to work for him. He was attracted by the opportunity of working for a hugely successful businessman. Paulson was persuaded to offer Fahad a position as a junior analyst at

Paulson & Co. Inc. Fahad accepted the position and began working for Paulson directly. Eventually, as the years passed, Fahad continued to earn Paulson's trust and he began to ascend to the point where he was effectively serving as the senior manager of Paulson's investments in Puerto Rico.

10. However, recent evidence has revealed Fahad's and his family's involvement in a long-standing series of fraudulent activities, including bribery, kickbacks, self-dealing, and misappropriation schemes. These actions were perpetrated against Paulson and his entities in connection with Fahad's oversight of Paulson's substantial investments in Puerto Rico. Fahad's shady dealings have resulted in protracted litigation between him and Paulson's entities.

***Tennenbaum meets Fahad***

11. Tennenbaum and Fahad met in or around 2015 when Paulson introduced Tennenbaum to Fahad. As their relationship evolved, Fahad concentrated his efforts into earning Tennenbaum's trust by assuring him that he was a loyal friend and almost like a brother.

12. In January 2020, Fahad invited Tennenbaum to his wedding and sat him in a preferential table with the event's most important guests, including now disgraced former governor of Puerto Rico, Wanda Vazquez.

13. Tennenbaum took Fahad at his word and believed that his overtures of friendship were sincere. He believed that Fahad had his best interest at heart and trusted his intentions and judgment. Unfortunately, time proved that the trust Tennenbaum deposited in Fahad was ill-placed, and that Fahad's overtures of friendship were simply calculated moves to strengthen his ties with Tennenbaum for selfish economic reasons.

***The birth of Innoveo, Inc.***

14. There are three relevant Innoveo entities for purposes of this Complaint: (1) Innoveo AG; (2) Innoveo Pte Ltd., and (3) Innoveo, Inc.

15. Innoveo AG was created under the laws of Switzerland in 2007. It allegedly developed a no-code platform for entities, such as insurance companies, to build enterprise-grade software.

16. As of on or around April 7, 2021, Innoveo AG's ownership was as follows: Innoveo Pte Ltd. – 26.8%; iSource LLC – 66.1%; and founders and management – 4.3%.

17. At all relevant times, Fahad was the Managing Member and Chairman of the Board of Directors of iSource LLC ("iSource"), a limited liability corporation created under the laws of Puerto Rico.

18. On April 7, 2021, Innoveo AG's shareholders executed an Investment Agreement (the "Innoveo AG Investment Agreement") providing for, among other things, certain rights, and obligations of its shareholders, including the conversion of Innoveo AG into a United States entity by means of a contribution of the outstanding shares of Innoveo AG in exchange for shares of the new United States entity.

19. On August 6, 2021, the so-called United States entity was established when Innoveo, Inc. was formed under Delaware law.

**The Ghaffar Brothers dupe Tennenbaum into investing in Innoveo**

20. In early 2021, Fahad and Amir Ghaffar willfully and fraudulently induced Tennenbaum to invest in Innoveo AG by engaging in a calculated scheme of deception[1].

---

[1] Although properly identified as Innoveo AG in the forthcoming paragraphs, Fahad and Amir did not distinguish between the different Innoveo entities when inducing Tennenbaum to invest in the company, nor did they discuss with Tennenbaum the plans for Innoveo AG's eventual conversion into what is now Innoveo, Inc. Fahad limited himself to cryptically stating that there were some "disclosure issues."

21. Fahad initiated his fraudulent campaign to lure Tennenbaum into investing in Innoveo in or around January 2021, deliberately targeting him with false assurances and misrepresentations.

22. Upon information and belief, the Ghaffar brothers were actively soliciting investments from Paulson and Tennenbaum because Innoveo AG was hemorrhaging cash and in dire need of capital. Rather than disclose the company's precarious financial condition, they knowingly and intentionally misrepresented Innoveo's viability and prospects to make the investment appear attractive. They concealed critical facts and misled Tennenbaum into making a substantial investment under false pretenses.

23. On or about January 31, 2021, Fahad contacted Tennenbaum, whom he referred to as a close friend and "brother," and aggressively promoted Innoveo AG as a lucrative and exceptional investment opportunity, despite knowing this characterization was false.

24. During that call, Fahad made multiple material misrepresentations with the clear and fraudulent intent to secure Tennenbaum's investment. These statements were not mere exaggerations, they were deliberate lies crafted to deceive.

25. Fahad's misrepresentations were calculated falsehoods, designed to exploit the trust and personal relationship he had cultivated with Tennenbaum. Fahad knew that Tennenbaum valued his opinion and would reasonably rely on his investment advice. Fahad's actions were a betrayal of that trust, executed with full knowledge of their deceptive nature.

26. Fahad began the conversation by falsely claiming that Paulson had already committed to investing in Innoveo, intending to leverage Paulson's reputation to lend credibility to the investment. Fahad knew that invoking Paulson's name would significantly influence Tennenbaum's perception and interest.

27. During the January 2021 phone call, Fahad made the following material misrepresentations to Tennenbaum: 1) that Innoveo AG's market valuation of approximately $60,000,000 was significantly below its true value; 2) that Innoveo AG owned and was enhancing cutting-edge technology for insurance software; 3) that Innoveo AG was experiencing rapid growth; and 4) that Fahad, as Chairman of the Board, possessed the requisite expertise and experience to successfully lead and scale the company.

28. Each of these representations was materially false and misleading. Fahad either knew they were untrue or acted with reckless disregard for the truth. His only interest in making these representations was supplying Innoveo with much needed cash to protect his and his brother's investment to the detriment of the new wave of investors, namely Tennenbaum.

29. Tennenbaum reasonably relied on these misrepresentations in deciding to invest in Innoveo, trusting Fahad's representations as accurate and made in good faith.

30. Had Fahad provided an accurate portrayal of Innoveo's state and the quality of its products, Tennenebaum would have never considered investing in the company.

31. In or around early February 2021, Amir Ghaffar met with Tennenbaum for lunch at Tennenbaum's residence in Rio Grande, Puerto Rico.

32. Amir reinforced and expanded upon Fahad's fraudulent inducement by falsely claiming that Innoveo owned advanced software suitable for use in the financial sector. Amir asserted that the software was ideal for major institutions such as Mass Mutual and UBS and even requested introductions to contacts at those firms to pitch the product.

33. Amir's claims regarding the suitability of Innoveo's software for financial giants like Mass Mutual and UBS were materially false and misleading. The software lacked the capabilities Amir described and was not viable for such applications.

34. Tennenbaum reasonably relied on Amir's representations in deciding to invest in Innoveo, believing the company's technology had genuine market potential in the financial sector.

35. Tennenbaum's reliance on Amir's representations was particularly reasonable given that they were consistent with those made by Fahad, a person Tennenbaum at the time trusted and respected, and because Amir was Fahad's brother.

36. As part of the broader scheme to defraud Tennenbaum, Fahad Ghaffar orchestrated a deceptive arrangement involving the law firm Ferraiouli LLC ("the Law Firm"). Fahad caused the Law Firm to assure Tennenbaum that the firm was representing his interests in connection with the Innoveo investment. In reality, the Law Firm was deeply loyal to Fahad, who, through his work at Paulson's entities, became one of its most important clients. This misrepresentation of legal representation and loyalty was a critical component of Fahad's strategy to control the flow of information to Tennenbaum and to create a false sense of security and legitimacy around the investment process.

37. The Law Firm played a central role in drafting the investment documents, facilitating the closing of the transaction, and managing communications related to the transfer of funds and issuance of shares. Throughout this process, the firm operated under Fahad's influence, prioritizing his interests while misleading Tennenbaum into believing he had independent legal counsel safeguarding his investment. This false representation of legal advocacy deprived Tennenbaum of the opportunity to receive impartial advice and to uncover the true financial condition and operational deficiencies of Innoveo.

38. By manipulating the Law Firm's involvement, Fahad was able to further conceal material facts and reinforce the illusion of a legitimate and promising investment. The law firm's role lent an air of credibility to the transaction, which was essential to securing Tennenbaum's trust and

commitment of $4,000,000. This misuse of legal counsel was not merely unethical—it was instrumental in executing and perpetuating the fraud, and it directly contributed to Tennenbaum's reliance on the Ghaffar brothers' misrepresentations.

39. As a direct result of the Ghaffar brothers' coordinated and fraudulent misrepresentations, Tennenbaum committed $4,000,000 to the first round of investments in Innoveo, through the Estancias Twelve Trust.

40. Through the Innoveo AG Investment Agreement, the company issued 19,021 Class A Preferred Shares, the totality of which were attributed to iSource. The issue price of the Class A Preferred Shares was set at $788.60 per unit for a total approximate value of $15,000,000.

41. On April 8, 2021, Tennenbaum received correspondence from Amir informing that, pursuant to the April 7, 2021 investment agreement, iSource agreed to subscribe to 5,072 newly issued Class A Preferred Shares in Innoveo AG for a total consideration of $4,000,000 on behalf of Estancias Twelve Trust and requested the transfer of that amount to iSource's designated bank account at Banco Popular de Puerto Rico ("Banco Popular").

42. Estancias Twelve Trust transferred $4,000,000 to iSource's designated bank account at Banco Popular on April 8, 2021.

43. On April 28, 2021, the Fourth Amended and Restated Limited Liability Company Agreement of iSource LLC was executed. Through this agreement, Estancias Twelve Trust and Paulson PRV Holdings LLC were admitted as members of iSource.

44. On August 16, 2021, Innoveo AG contributed the 5,072 Class A Preferred Shares originally subscribed for by iSource on behalf of Estancias Twelve Trust to the recently formed Innoveo, Inc.

45. On September 14, 2021, Estancias Twelve Trust redeemed its 5,072 Class A Preferred Shares in iSource in exchange for 5,072 Class A Preferred Shares in Innoveo, Inc. and officially became a shareholder of Innoveo, Inc.

46. In May 2022, Innoveo, Inc. initiated a second round of funding (the "second investment round"), continuing its efforts to raise capital while still operating under the false pretenses established during the initial fraudulent inducement.

47. On May 16, 2022, Tennenbaum, acting through the Estancias Twelve Trust, invested an additional $435,307 in Innoveo, Inc. by purchasing 552 shares of common stock at a price of $788.60 per share. This investment was made in reliance on the same materially false representations previously made by Fahad and Amir Ghaffar, which had never been corrected or clarified.

48. At the time of this second investment, Tennenbaum remained unaware of the true state of Innoveo's business and continued to rely on the Ghaffar brothers' original misrepresentations. Specifically, their false claims regarding Innoveo's valuation, technological capabilities, growth trajectory, and market potential. The Ghaffar brothers' failure to disclose the falsity of their prior statements perpetuated the fraud and directly influenced Tennenbaum's decision to inject additional capital into the company.

*Innoveo's Harsh Reality*

49. Not surprisingly, the façade that Fahad and Amir had created regarding the potential of Innoveo soon faded.

50. Innoveo, Inc.'s earnings before interest, taxes, depreciation, and amortization (EBITA) were in a downward spiral during the first and second investment rounds, with a drop of 130.05% from 2020 to 2022.

51. During the summer of 2023, Tennenbaum sought assurances from Fahad regarding measures to protect his investment in Innoveo, Inc. At that time, Fahad admitted that the company was struggling. To dissuade Tennenbaum from taking action, Fahad promised to personally guarantee him against any loss related to his investment. This promise reinforced Tennenbaum's belief that Fahad intended to act in good faith and concealed Fahad's true intent to deceive.

52. On November 6, 2023, after Tennenbaum demanded the return of his investment due to Innoveo's deteriorating condition, Fahad assured him that his concerns were unfounded, stating that "the company has significantly grown revenues since Tennenbaum invested and continues to be a going concern." This statement was knowingly false and intended to lull Tennenbaum into inaction.

53. Subsequently, on November 13, 2023, Amir emailed Tennenbaum and repeated what are now known to be lies. Amir falsely claimed that Innoveo was stable, nearing breakeven, and growing through existing and new customers. He further emphasized that he and his partners continued investing at a $60 million valuation. These misrepresentations were designed to reinforce the illusion of viability and conceal the truth.

54. It was only months later—after reviewing Innoveo's financial collapse and the impending asset sale—that Tennenbaum realized Amir's and Fahad's assurances were false and that he had been deliberately misled. Critically, Tennenbaum did not discover, and could not reasonably have discovered, the Ghaffar's intent to deceive him and the bounds of their fraud until late 2023, several weeks after Amir's email.

55. On May 6, 2024, Innoveo, Inc. held a board of directors and shareholders meeting where, through its current Chief Executive Officer, Vinod Kachroo. The company informed its

shareholders that, unless it was able to secure additional funding by May 20, 2024, it would cease all operations and file for Chapter 7 bankruptcy. A resolution to that effect was unanimously approved by Innoveo, Inc.'s board of directors.

56. Upon information and belief, while Fahad and Amir Ghaffar were financially compensated for their roles as officers and/or directors of Innoveo, Inc., Tennenbaum invested a total of $4,435,307 into a company that was, in reality, insolvent and devoid of the technological capabilities and business prospects the Ghaffar brothers had falsely promoted.

57. The software touted as "cutting-edge" never existed in the form or functionality described, and the company's alleged growth was grossly overstated. Fahad failed to disclose that a significant portion of Innoveo's so-called "new" business was artificially generated through entities owned by Paulson but administered by Fahad himself—effectively using his position within Paulson's network to funnel contracts to Innoveo and fabricate the appearance of market traction. This deceptive maneuver inflated Innoveo's valuation and misled Tennenbaum into believing the company was thriving. In truth, the Ghaffar brothers orchestrated a calculated and self-serving scheme, using deceptive promises and manipulative sales tactics to induce Tennenbaum into investing millions in a company that was never what they claimed it to be.

***The Sale of Innoveo's Assets***

58. Although Mr. Tennenbaum had serious concerns regarding the circumstances under which his investment in Innoveo had been solicited and managed, he ultimately allowed the sale of Innoveo's assets to proceed in reliance on Fahad's promise to guarantee him against any loss related to his investment. His decision was guided by a duty to mitigate damages and to preserve whatever residual value could be recovered for the Estancias Twelve Trust. The

proposed transaction offered at least some opportunity to recoup a portion of the investment through a combination of limited cash consideration and equity in the acquiring entity.

59. As reflected in the waterfall shared with the shareholders, Innoveo's total consideration amounted to approximately $17.5 million, of which only $5.7 million was paid in cash or promissory notes and the remainder was issued in stock of the acquiring company.

60. From this amount, the Estancias Twelve Trust, holding roughly 27% of the preferred equity, stood to receive a modest fraction of its $4 million capital contribution, subject to further deductions for escrow and working capital reserves. In agreeing not to obstruct the closing, Tennenbaum sought to prevent a total loss.

61. Nevertheless, the sale did not come close to making Tennenbaum or the Estancias Twelve Trust whole. The equity consideration received in lieu of cash has, to date, shown minimal market value or liquidity. Any paper gains projected from the issuance of stock in the new company remain largely theoretical, and the escrowed portions of the purchase price are contingent upon uncertain post-closing adjustments and indemnity claims. Thus, while the transaction mitigated further losses by preserving a narrow avenue of recovery, it did not cure the underlying harm caused by the fraudulent inducement of his original investment.

62. The outcome of Innoveo's asset sale starkly confirms the core of Tennenbaum's fraud allegations. Contrary to the Ghaffar brothers' repeated representations that Innoveo was a high-growth, scalable technology company with proprietary software and strong market demand, the company was ultimately sold for a fraction of the capital invested. This outcome is not merely disappointing, it is damning. It demonstrates that Innoveo was never a viable or sustainable enterprise, and that its purported value was grossly inflated through deliberate misrepresentations. The company's inability to attract meaningful strategic interest or market

valuation, despite substantial capital infusions, reveals that the projections and claims made to Tennenbaum were materially false from the outset. Moreover, the artificial "growth" Fahad touted, driven by internal contracting through Paulson-affiliated entities he controlled—further underscores the deceptive nature of the scheme.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Securities Fraud in Violation of 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5
(Against Fahad Ghaffar and Amir Ghaffar)**

63. Tennenbaum repeats and realleges the allegations of paragraphs 1 through 62 as if fully set forth herein.

64. Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78(j)(b).

65. Rule 10b-5, the concomitant regulation to Section 10(b), makes it unlawful for anyone engaged in the purchase or sale of a security to "directly or indirectly":

    (a) . . . employ any device, scheme, or artifice to defraud,
    (b) . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
    (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. 240.10b-5.

66. Fahad and Amir Ghaffar knowingly and fraudulently induced Tennenbaum to invest a total of $4,435,307 in Innoveo, Inc., through a calculated scheme of material misrepresentations and omissions designed to mislead and manipulate.

67. In exchange for Tennenbaum's investment, Fahad and Amir offered securities—specifically, Class A Preferred Shares and common stock in Innoveo, Inc.—which were sold to Estancias Twelve Trust under false pretenses.

68. Tennenbaum reasonably relied on Fahad's and Amir's materially false statements regarding Innoveo's valuation, technological capabilities, and growth trajectory when he invested $4,000,000 in April 2021, through the purchase of 5,072 units of iSource Class A Preferred Shares (later redeemed and converted to Innoveo, Inc. Class A Preferred Shares on September 14, 2021), and an additional $435,307 on May 16, 2022, through the purchase of 552 units of common stock.

69. Specifically, during a January 2021 phone call, Fahad made the following material misrepresentations to Tennenbaum: 1) that Innoveo AG's market valuation of approximately $60,000,000 was significantly below its true value; 2) that Innoveo AG owned and was enhancing cutting-edge technology for insurance software; 3) that Innoveo AG was experiencing rapid and sustainable growth; and 4) that Fahad, as Chairman of the Board, possessed the expertise and experience necessary to successfully scale the business.

70. Tennenbaum reasonably relied on these representations, believing them to be true and material to his investment decision.

71. In or around early February 2021, Amir Ghaffar reinforced Fahad's misrepresentations during a lunch meeting at Tennenbaum's residence in Rio Grande, Puerto Rico. Amir, then CEO of Innoveo AG, falsely claimed that the company owned proprietary software suitable for use in the financial sector and asserted that it was being positioned for adoption by major institutions such as Mass Mutual and UBS. Amir further requested introductions to contacts at these firms to pitch the software, thereby deepening the deception.

72. Tennenbaum reasonably relied on Amir's representations regarding the software's viability and market potential when deciding to invest in Innoveo.

73. Fahad and Amir made these misrepresentations with scienter—that is, with actual knowledge of their falsity or with reckless disregard for the truth—and with the intent to induce Estancias Twelve Trust's investment for their own personal benefit, given their roles as directors, officers, and stakeholders in Innoveo, Inc.

74. Tennenbaum's decision to invest $4,435,307 in Innoveo, Inc. was directly and proximately caused by his reasonable reliance on the Ghaffar brothers' fraudulent statements and omissions.

75. The misrepresentations made by Fahad and Amir were material to Tennenbaum's investment decision, as they concerned the core value proposition of the company—its financial health, technological assets, and growth prospects.

76. These misrepresentations were made "in connection with" the purchase of securities, as they directly influenced and induced Estancias Twelve Trust's acquisition of Class A Preferred Shares and common stock in Innoveo, Inc.

77. But for Fahad's and Amir's fraudulent misrepresentations, Tennenbaum would not have invested in Innoveo, Inc. or purchased its securities.

78. As a direct and proximate result of Fahad's and Amir's material misrepresentations and fraudulent conduct, Estancias Twelve Trust has suffered substantial damages, including but not limited to the portion of its investment that it will not recover pursuant to the sale of Innoveo's assets, to be determined or proven at trial.

### SECOND CLAIM FOR RELIEF

**Unjust Enrichment in Violation of Puerto Rican Law**
**(Against Fahad Ghaffar and Amir Ghaffar)**

79. Tennenbaum repeats and realleges the allegations of paragraphs 1 through 62 above as if fully set forth here.

80. Fahad and Amir Ghaffar were unjustly enriched by Estancias Twelve Trust's $4,435,307 investment in Innoveo, Inc. Although the investment was nominally made into the company, the Ghaffar brothers personally benefited from the funds through compensation received in their capacities as officers and directors, and through their control over Innoveo's operations and affiliated entities. Fahad also leveraged his position within Paulson-affiliated entities to artificially inflate Innoveo's business activity, thereby enhancing his own standing and influence while misrepresenting the company's growth.

81. Estancias Twelve Trust was correspondingly impoverished, having invested millions of dollars based on fraudulent representations, only to see the company collapse and its assets sold for a fraction of the invested capital. The Trust received no meaningful return, while the Ghaffar brothers extracted personal and professional gain from the transaction.

82. There exists no legal or equitable principle that justifies Fahad and Amir's enrichment at Estancias Twelve Trust's expense. Their benefit was obtained through deception, manipulation of legal counsel, and misrepresentation of material facts concerning Innoveo's valuation, technology, and business prospects.

83. It would be against equity and good conscience to allow Fahad and Amir to retain the benefits derived from Estancias Twelve Trust's investment, particularly given the fraudulent means by which the investment was solicited and the total loss suffered by the Trust.

84. As a result, Estancias Twelve Trust has been damaged in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Dolus/Fraud Pursuant to Article 1168 of the Puerto Rico Civil Code of 2020
### (Against All Defendants)

85. Tennenbaum repeats and realleges the allegations of paragraphs 1 through 62 above as if fully set forth herein.

86. Fahad and Amir made misrepresentations to Tennenbaum concerning Innoveo, Inc.

87. These misrepresentations were material to the transaction that Fahad and Amir induced Tennenbaum into entering into on behalf of Estancias Twelve Trust.

88. These misrepresentations were made with the intent that Tennenbaum act on them and transfer $4,435,307 to entities owned and controlled by Fahad and Amir.

89. As a result, Estancias Twelve Trust has been damaged in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Damages for Bad Faith Pursuant to Article 18 of the Puerto Rico Civil Code of 2020
### (Against Fahad Ghaffar and Amir Ghaffar)

90. Tennenbaum repeats and realleges the allegations of paragraphs 1 through 62 above as if fully set forth herein.

91. Fahad and Amir acted in bad faith in obtaining Tennenbaum's investment in Innoveo, Inc.

92. Fahad and Amir have acted in bad faith for the purpose of obtaining benefits from Tennenbaum, while denying benefits that were due to Tennenbaum.

93. By reason of the foregoing, Estancias Twelve Trust has been damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Violation of the Uniform Securities Act of Puerto Rico
### (Against All Defendants)

94. Tennenbaum repeats and realleges the allegations of paragraphs 1 through 62 above as if fully set forth herein.

95. Section 890 of the Uniform Securities Act of Puerto Rico provides that any person who offers or sells a security by means of a false statement of a material fact or omitting to state a material

fact needed to prevent that any statement made, in the light of the circumstances under which it was made, leads to misunderstanding (the buyer not knowing of the falsehood or omission), and does not support the burden of proof that he did not know, and in exercising reasonable prudence, could not have known of the falsehood or omission, shall be liable to the person who buys the security.

96. Tennenbaum purchased a security from Innoveo, Inc.

97. Fahad and Amir sold such security by means of a false statement of material fact, and did so knowingly, specifically, Fahad and Amir misrepresented Innoveo, Inc.'s value and sophistication of the technology upon which its growth and business depended.

98. By reason of the foregoing, Fahad and Amir are liable to Estancias Twelve Trust in an amount to be proven at trial.

**<u>SIXTH CLAIM FOR RELIEF</u>**

**Estoppel**
**(Against All Defendants)**

99. Puerto Rico law's equitable estoppel doctrine ("actos propios") prohibits persons from going against their own acts.

100.    "The necessary premises or constituting elements for the application of the juridical rule that no one can go against his own acts may be summarized as follows: (a) a certain behavior of a subject, (b) that he has given life to a situation contrary to reality, that is, apparent and, through such appearances, may influence the behavior of others, and (c) that it be the basis of the trust of another party which has acted in good faith and that, for that reason, has acted in a manner which would cause him prejudice if his trust was defrauded." Int'l Ge. v. Concrete Builders of P.R., 104 D.P.R. 871, 877-878 (1976); see also Vivoni Farage v. Ortiz Carro, 179

D.P.R. 990 (2010); <u>Comisionado de Seguros de Puerto Rico v. Universal Insurance Company, Inc.</u>, 187 D.P.R. 164 (2012).

101.   During the summer of 2023, Fahad promised Tennenbaum that he would return his $4,435,307 investment in Innoveo, Inc.

102.   Tennenbaum trusted Fahad and believed his promise of returning the $4,435,307 investment in Innoveo, Inc.

103.   Tennenbaum acted in good faith and refrained from acting against Defendants to recover his investment and/or damages related to the investment.

104.   Tennenbaum would be prejudiced if his trust that Defendants were going to return his investment was defrauded.

105.   By reason of the foregoing, the Defendants are liable to Tennenbaum in an amount to be proven at trial.

WHEREFORE, Plaintiff Michael Tennenbaum demands judgment as follows:

     a.   Awarding damages in an amount to be determined at trial but presently believed to exceed $1,500,000.00;

     b.   Granting such other equitable or injunctive relief as may be appropriate under the circumstances;

     c.   Awarding plaintiff his costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees, and other costs, interest, and disbursements; and

     d.   Granting such other and further relief as the Court may deem just and proper.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

**RESPECTFULLY SUBMITTED** San Juan, Puerto Rico, on October 31st, 2025.

                                                                   **DMR Law LLC**
                                                                   **Counsel for Plaintiff**

Capital Center Bldg.
Suite 1101
San Juan, PR 00918
Tel. 787-331-9970

*s/ Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
maria.dominguez@dmralaw.
com

*s/Javier F. Micheo Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com

*s/ Julián R. Rodríguez-Muñoz*
Julián R. Rodríguez-Muñoz
USDC-PR No. 308301
j.rodriguez@dmrpr.com